**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
SOUTHERN DIVISION**

| | |
|---|---|
| RAYMOND MENDEZ, | * |
| Plaintiff, | * |
| v. | *  Case No. 10-cv-02266-AW |
| NATIONWIDE PROPERTY AND CASUALTY INSURANCE CO., | * |
| Defendant. | * |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

**MEMORANDUM OPINION**

Plaintiff Raymond Mendez ("Mendez") filed this case against Nationwide Property and Casualty Insurance Company ("Nationwide") on June 2, 2010, based on Nationwide's refusal to pay Mendez under a homeowner's insurance policy for losses sustained in a fire. Pending before the Court is Nationwide's Motion for Summary Judgment on Mendez's breach of contract claim. Doc. No. 40. The Court has reviewed the parties' briefs and exhibits and concludes that no hearing is necessary. *See* Loc. R. 105.6 (D. Md. 2011). For the reasons articulated below, Defendant's Motion will be DENIED.

**I. FACTUAL AND PROCEDURAL BACKGROUND**

The following facts are drawn from the parties' briefs and attached exhibits and are undisputed, unless otherwise noted. On June 3, 2008, Defendant Nationwide issued homeowner's insurance policy No. 52 19 HO 888334 (the "Policy") to Plaintiff Raymond Mendez for his property located at 105 Stan Fey Drive in Upper Marlboro, Maryland. Doc. No. 40-4, B00002. The Policy was in effect when a fire engulfed Mendez's home on June 15, 2009.

*Id.*; Doc. No. 2, ¶¶ 5, 9. The Policy included the following disclaimer under the heading "CONCEALMENT OF FRAUD":

> This policy does not provide coverage for all insureds if you or any other insured, either before or after the loss, has:
> (1) Intentionally concealed or misrepresented any material fact or circumstance; or
> (2) committed any fraud or made false statements relating to such loss.

Doc. No. 40-4, B00036.

Soon after the fire, Mendez employed his son, Amilcar Mendez ("Amilcar"), to assist him with drafting inventories and placing values on lost or destroyed items, as Amilcar had personal knowledge of the home's contents and the value of the personal property. Mendez and his son were told by Nationwide's agents to list items of identical or similar quality and value as those lost in the fire, and that "time was of the essence" in submitting the claims. Doc. No. 53-3, ¶ 11; Doc. No. 53-5, ¶¶ 2, 6–7. Mendez avers that he was suffering kidney failure and was physically unable to do the inventory by himself given his weakened condition. *See* Doc. No. 53-3, ¶¶ 18–19. Nationwide disputes this claim, citing Mendez's own affidavit, deposition testimony and responses to interrogatories suggesting that he was in satisfactory physical condition and was preparing part of the inventory himself. *See* Doc. No. 57, at 6–7. Mendez also avers that at the time the inventories were being prepared, he believed his son's personal property was covered by the Policy. Doc. No. 53-3, ¶ 17.

Within weeks of the fire, Mendez submitted three binders to Nationwide containing images of the personal property he was claiming was lost or destroyed. *See* Doc. Nos. 40-7 and 40-8; Doc. No. 42, C00039, 150:9–21. Mendez also submitted typed lists to Nationwide containing items of personal property destroyed in the home, the location of the items in the home, the costs of replacing the items, and the retailers from which replacement items could be

purchased.  Doc. No. 44, E00032–50.  Although he received help from his son in preparing these inventories, Mendez acknowledges that he personally reviewed them prior to submitting them to Nationwide.  Doc. No. 42, C00039, 150:6–151:13; Doc No. 53-3, ¶ 19.  On November 3, 2009, Mendez formally filed a claim under the Policy for $1,299,000.00 based on losses sustained in the fire.  Doc. No. 44, E00001.  At some point after he submitted the inventories, Mendez sought return of the binders so he could verify their accuracy, but Nationwide refused access, telling him an investigation was being conducted.  Doc. No. 53-3, ¶ 10.  Mendez claims that Nationwide cut off all communication with him and his family within two or three weeks of the fire, and effectively ignored him until his November 30, 2009 Examination Under Oath ("EUO").  *Id.* ¶¶ 14, 16.

Mendez filed suit against Nationwide in the Circuit Court of Prince George's County on June 2, 2010, alleging that Nationwide breached the Policy and acted in bad faith by failing to compensate Mendez for his losses.  *See* Doc. No. 2.  Nationwide formally denied Mendez's claims in a letter dated June 11, 2010, informing him that the Policy was void due to the cause of the fire and false statements made by Mendez during the claims process.  Doc. No. 40-9, at 5.  The case was removed to this Court on August 19, 2010.  The Court dismissed Mendez's bad faith claim on December 21, 2010, Doc. No. 11, and granted judgment in favor of Nationwide on Mendez's claims for physical, mental, and credit injuries on September 13, 2011, Doc. No. 23.  Only Mendez's breach of contract claim remains.

Nationwide sent Mendez a supplemental denial letter on April 2, 2012, citing Mendez's false claims regarding lost or destroyed artwork, uncut diamonds, and furs as specific grounds for the denial of coverage.  Doc. No. 40-10.  Nationwide bases its June 28, 2012 Motion for

Summary Judgment, Doc. No. 40, on Mendez's false statements regarding these items.[1] Mendez does not dispute that the initial claims regarding the artwork, uncut diamonds, and furs were false. However, Mendez argues that he did not make false statements with knowledge that they were false or with the purpose of defrauding Nationwide, and that the inaccuracy of the information can be explained by lack of knowledge, inadvertence, honest mistake, or poor judgment.

**II. STANDARD OF REVIEW**

Summary judgment is only appropriate "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 323–25 (1986). The Court must "draw all justifiable inferences in favor of the nonmoving party, including questions of credibility and of the weight to be accorded to particular evidence." *Masson v. New Yorker Magazine, Inc.*, 501 U.S. 496, 520 (1991) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)). In ruling on a motion for summary judgment, "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge . . . ." *Okoli v. City of Baltimore*, 648 F.3d 216, 231 (4th Cir. 2011) (quoting *Anderson*, 477 U.S. at 255).

To defeat a motion for summary judgment, the nonmoving party must come forward with affidavits or other similar evidence to show that a genuine issue of material fact exists. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). A disputed fact

---

[1] In their briefs, the parties discuss and disagree over other matters, including the cause of the fire and Mendez's claims as to other lost or destroyed property, such as a Rolex watch and firearms. Nationwide's Motion for Summary Judgment is based on Mendez's false statements regarding the artwork, uncut diamonds, and furs, however, and the Court gives no consideration to these other matters.

presents a genuine issue "if, after reviewing the record as a whole . . . a reasonable jury could return a verdict for [the non-moving party]." *Evans v. Techs. Applications & Serv. Co.*, 80 F.3d 954, 959 (4th Cir. 1996) (citing *Anderson*, 477 U.S. at 248). Although the Court should believe the evidence of the nonmoving party and draw all justifiable inferences in his favor, a nonmoving party cannot create a genuine dispute of material fact "through mere speculation or the building of one inference upon another." *Beale v. Hardy*, 769 F.2d 213, 214 (4th Cir. 1985).

**III. ANALYSIS**

A. Plaintiff's Affidavits

The Court will begin by addressing Nationwide's argument that Mendez's and Amilcar's affidavits should be stricken and not considered in the Court's summary judgment ruling because they contain statements that contradict the affiants' prior deposition testimony.[2] "[A] party cannot create a genuine issue of fact sufficient to survive summary judgment simply by contradicting his or her own previous sworn statement (by, say, filing a later affidavit that flatly contradicts that party's earlier sworn deposition) without explaining the contradiction or attempting to resolve the disparity." *Cleveland v. Policy Mgmt. Sys. Corp.*, 526 U.S. 795, 806 (1999). Permitting a party to do so "would greatly diminish the utility of summary judgment as a procedure for screening out sham issues of fact." *Barwick v. Celotex Corp.*, 736 F.2d 946, 960 (4th Cir. 1984).

However, application of the sham affidavit rule at the summary judgment stage "must be carefully limited to situations involving flat contradictions of material fact." *Mandengue v. ADT*

---

[2] Nationwide apparently requests that the affidavits be stricken in their entirety. Even if the Court agreed that the averments in the affidavit contradicted the affiants' prior testimony, it would only strike the contradictory portions of the affidavits. *See, e.g.*, *Evans*, 80 F.3d at 962 (finding it appropriate for district courts to strike and disregard portions of affidavit deemed inadmissible or improper)*; Parker v. Davis*, 900 F. Supp. 788, 793 (D. Md. 1995) (disregarding portion of affidavit that contradicted prior testimony).

*Sec. Sys., Inc.*, No. ELH-09-3103, 2012 WL 892621, at *18 (D. Md. Mar. 14, 2012). The court in *Mandengue* elaborated on this important limitation of the rule:

> The inconsistency between a party's deposition testimony and subsequent affidavit must be clear and unambiguous to justify striking the affidavit. Thus, the non-moving party is not precluded from elaborating upon, explaining or clarifying prior testimony elicited by opposing counsel on deposition and minor inconsistencies that result from an honest discrepancy, a mistake, or newly discovered evidence afford no basis for excluding an opposition affidavit.

*Id.* (quoting *Van Asdale v. Int'l Game Tech.*, 577 F.3d 989, 998–99 (9th Cir. 2009) (alterations omitted) (internal quotation marks omitted)). Although there appear to be some discrepancies between the affidavits and Mendez's and Amilcar's prior testimony, the Court concludes that these inconsistencies are not so clear and unambiguous as to require the striking of the affidavits or portions thereof.

### 1. Mendez's averments regarding the definition of "artwork"

At his deposition, Mendez stated that he owned about 15 pieces of art with an estimated value of $10,000.00, and that by "pieces of art," he was referring to paintings and prints. Doc. No. 42, C00041, 161:11–17. He also stated during his deposition that these numbers would have constituted his best estimates at the time of the fire. *Id.*, C00040, 156:18–157:11. Nationwide seeks to strike Mendez's statement in his affidavit that he and Amilcar, who helped draft the statement and inventory, had different understandings of what was encompassed within the term "artwork." *See* Doc. No. 53-3, ¶¶ 1–3. Specifically, Mendez avers that Amilcar's letter to Nationwide identified 60 to 65 pieces of artwork because Amilcar did not differentiate between photographs, posters, prints, and paintings. *Id.* ¶¶ 1–2. The Court discerns no clear and unambiguous contradiction between this averment and Mendez's prior deposition testimony. If anything, Mendez is attempting to explain the discrepancy between the initial claims and his own deposition testimony, but there is no flat contradiction between his prior testimony and affidavit

statements. To be sure, Nationwide may find it fruitful to ask Mendez on cross-examination why he submitted a claim for 60 to 65 pieces of "artwork" when he only owned around 15 pieces under his own definition of the term.[3] However, the Court will not invoke the sham affidavit rule and strike statements regarding the artwork from Mendez's affidavit.

### 2. Mendez's averments regarding the valuation of uncut diamonds

During his deposition, Mendez admitted that his claim for $30,000.00 in uncut diamonds was a "mistake" and was "incorrect." Doc. No. 42, C00025, 94:10–21. Mendez also stated during his deposition that he didn't know if the uncut diamonds were "worth anything" and that they could have been worth "close to zero." *Id.*, C00025, 95:1–17. Nationwide seeks to strike Mendez's averment in his affidavit that the claim for $30,000.00 was his and Amilcar's best estimate based on what they thought was fair and honest and what they found on the Internet. *See* Doc. No. 53-3, ¶¶ 8–9. Again, the Court discerns no flat contradiction between this averment and Mendez's prior deposition testimony. Rather, Mendez appears to be elaborating as to how and why he submitted the claim, but he is not denying in his affidavit that the claim was incorrect or that the diamonds could have had minimal value. Furthermore, as will be discussed in greater detail below, Mendez's affidavit is largely consistent with other portions of his deposition testimony in which he attempted to explain the $30,000.00 figure. *See infra* Part III.C.2. Again, Nationwide may find it fruitful to explore Mendez's methodology and state of mind in submitting this claim on cross-examination, but the Court will not invoke the sham affidavit rule to strike this portion of Mendez's affidavit.

### 3. Amilcar's averments regarding the raccoon coat

Nationwide also seeks to strike the following averments from Amilcar's affidavit:

---

[3] As is discussed in greater detail below, *see infra* Part III.C.1, given the language of the statement of claim as well as other evidence in the record, there is a genuine dispute of material fact as to whether Mendez submitted the claims for the artwork knowing that the information was false and with the purpose of defrauding Nationwide.

>    8. I was mistaken when I listed a raccoon fur coat when I listed [sic] in the
>    inventories I submitted to Nationwide in June and July 2009. I did not know at
>    the time that the coat had been placed in storage.
>    9. I inadvertently listed the raccoon coat as a fur coat in the inventories I
>    submitted to Nationwide. I did not do so intentionally, although the coats have
>    almost the identical value.

Doc. No. 53-5, ¶¶ 8–9. In his deposition testimony, Amilcar stated that he did not know what the coat in question was made of. Doc. No. 57-17, 31:18-19. This testimony does not flatly contradict Amilcar's acknowledgement in the affidavit that he mistakenly and inadvertently listed the raccoon coat in the inventories. Nationwide also points out that Amilcar testified at his deposition that did not know how many furs his father owned, that he never asked his father, but that he thought he owned three. Doc. No. 57-17, 86:10-20. Again, the Court discerns no clear and unambiguous contradiction between this testimony and Amilcar's averments that the inaccurate submission was mistakenly and inadvertently made.[4] Nationwide is free to explore on cross-examination with Amilcar and Mendez why inaccurate claims regarding fur coats were submitted, but the Court will not strike these portions of Amilcar's affidavit.[5]

---

[4] Even if the Court struck these portions of Amilcar's affidavit, Nationwide would not be entitled to summary judgment. Based on Mendez's deposition testimony, discussed *infra* Part III.C.3, there is a genuine issue of material fact as to whether Mendez made the false statements with knowledge that they were false and with the intent to defraud Nationwide.

[5] Nationwide also argues that the affidavits were defective because they contained electronic signatures from the affiants and only attorneys are permitted to electrically sign documents pursuant to the Local Rules of this Court. *See* Loc. R. 102(a). However, this defect was cured when Mendez filed hand-signed affidavits on September 19, 2012. *See* Doc. Nos. 63 and 64.

Nationwide further argues that the affidavits are insufficient as a matter of law. Both affidavits contained affirmations that the contents were true and correct to the best of affiants' "knowledge, information, and belief." Doc. Nos. 53-3 and 53-5. Nationwide contends that these affidavits fail to comply with Rule 56 of the Federal Rules of Civil Procedure, which provides in relevant part that "[a]n affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Fed. R. Civ. Pro. 56(c)(4). The Court notes that Mendez's hand-signed affidavit contains a revised affirmation that the contents of the affidavits are based on his "*personal* knowledge, information, and belief." Doc. No. 63 (emphasis added). Regardless of the language of the original affirmations, however, the Court has reviewed the substance of Mendez's and Amilcar's affidavits and concludes that they may be considered in ruling on Nationwide's summary judgment motion. The affidavits appear to have been made on personal knowledge, set forth facts that would be admissible in evidence, and show that the affiants are competent to testify.

B. False Swearing

The Policy in this case provided, in relevant part, that Nationwide would not provide coverage if Mendez "(1) Intentionally concealed or misrepresented any material fact or circumstance; or (2) committed any fraud or made false statements relating to [a] loss." Doc. No. 40-4, B00036. To void the Policy, it must be established that Mendez engaged in "false swearing" when he submitted his claims to Nationwide:

> To constitute "false swearing" within the meaning of the contract of insurance, so as to render the policy void, the statement so made must not only be untrue, but it must be shown that it was knowingly and intentionally stated with knowledge of its untruthfulness, or that it was so stated as a truth when the party did not know it to be true, and had no reasonable grounds for believing it to be true, and was so made with the purpose to defraud.

*U.S. Fire Ins. Co. v. Merrick*, 190 A. 335, 342 (Md. 1937); *see also Great Sw. Fire Ins. Co. v. S.M.A., Inc.*, 474 A.2d 950, 954–55 (Md. 1984). "[T[he intent to defraud is not to be presumed and . . . all reasonable allowance [shall be made] for lack of knowledge, or sound judgment, or for honest mistake on the part of the insured." *Great Sw.*, 474 A.2d at 955 (quoting *Tru-Fit Clothes, Inc. v. Underwriters at Lloyd's London*, 151 F. Supp. 136, 139 (D. Md. 1957)).

Nationwide argues, in the alternative, that under the plain terms of the Policy, it is entitled to summary judgment if it shows that Mendez (1) made false statements related to his loss and (2) the statements were material.[6] In other words, Nationwide contends that it is not

---

[6] This two-pronged test is applicable where the insured makes false statements in his or her application for an insurance policy. Generally, insurance contracts are voidable and the insurer need not prove intent where the insured (1) made false statements in *entering* the insurance contract and (2) the statements were material. *See Clemons v. Am. Cas. Co.*, 841 F. Supp. 160, 165 (D. Md. 1993) (citing *Erie Ins. Co. v. Ins. Comm'r of State*, 579 A.2d 771, 773 (Md. Ct. Spec. App. 1993)). This test derives from "the general rule of the law of contracts," which provides that "when a party is *induced to enter* into a contract by fraud or *material misrepresentation*, the contract is voidable as against the party making the misrepresentation." *Miller v. Ins. Comm'r*, 521 A.2d 761, 768 (Md. Ct. Spec. App. 1987) (emphasis added). Nationwide is not arguing in the instant case that Mendez made any material misrepresentations in applying for the homeowner's policy, so this two-pronged test does not apply.

Furthermore, several cases relied upon by Nationwide in its briefs are inapposite. For example, Nationwide repeatedly cites *Phillips v. Allstate Indemnity Company*, 848 A.2d 681 (Md. Ct. Spec. App. 2004), but *Phillips* dealt with an insured's refusal to answer relevant, material questions during an EUO, which the court concluded was, in

required to prove that Mendez's false statements were made with the knowledge that they were false and with the purpose of defrauding the insurer. Nationwide's reading of the Policy must be rejected under recent Fourth Circuit precedent. In *Simms v. Mutual Benefit Insurance Company*, the policy at issue similarly provided that the insurer was not obligated to provide coverage for property losses if the insured "(1) Intentionally concealed or misrepresented any material fact or circumstance; (2) Engaged in fraudulent conduct; ***or (3) Made false statements***." 137 Fed. App'x 594, 596–97 (4th Cir. 2005) (emphasis added). As in this case, the insurer in *Simms* defended its denial of coverage on the grounds that the insured plaintiffs made false statements in support of their claims. *Id.* at 597.

Applying Maryland law, the *Simms* court noted that in isolation, the term "false statements" does not inherently indicate intent to deceive. *Id.* However, both "false statements" and "false swearing" specify "an untrue utterance," and the only difference between the phrases— that "false swearing" occurs under oath, while there is no such requirement for "false statements" —is of no consequence in the context of an insurance contract. *See id.* at 601 n.5. The court explained:

> [T]o void an insurance policy based upon an insured's "false swearing" the statement must have been knowingly and intentionally stated with knowledge of its untruthfulness or with reckless disregard for its truthfulness and with the purpose to defraud. . . . Because the law does not favor forfeitures, *Hartford Fire Ins. Co. v. Himelfarb,* 355 Md. 671, 681, 736 A.2d 295, 301 (1999), such a definition is necessary so that an insurer cannot avoid a claim simply because an insured unintentionally provided incorrect information. Moreover, it mimics the definition of fraud and intentional misrepresentation.

---

effect, a failure to cooperate that voided the policy. Nationwide's reliance on *Powell v. United States Fidelity and Guaranty Company*, 88 F.3d 271 (4th Cir. 1996), which affirmed summary judgment in favor of the insurer where the insured refused to answer questions and provide documents during the claims process, is similarly misplaced.

*Simms*, 137 Fed. App'x at 601 (footnotes omitted). The court concluded that the important similarity between "fraud," "intentional misrepresentation," and "false statements" is "the scienter requirement, and scienter must be proven by clear and convincing evidence." *Id.* at 601.

Accordingly, Nationwide is required to establish that there is no genuine issue of material fact that Mendez submitted false statements in support of his claim for coverage knowing that the statements were false or having no reasonable grounds for believing them to be true and that he did so with the purpose of defrauding Nationwide.

### C. Genuine Issues of Material Fact Remain

Although it is undisputed that Mendez made false statements regarding his losses, there remain genuine issues of material fact that preclude granting summary judgment in favor of Nationwide. Nationwide has failed to establish beyond reasonable dispute that Mendez's false statements were made with knowledge of their untruthfulness or with reckless disregard for their truthfulness. Nationwide has also failed to establish beyond reasonable dispute that Mendez's false statements were made with the purpose of defrauding Nationwide. Whether Mendez committed false swearing in submitting his claims on the artwork, uncut diamonds, and furs requires ascertaining his state of mind, determining the credibility of witnesses, weighing of the evidence, and drawing inferences from the facts presented. Such functions must be performed by the jury, not the judge. *See, e.g.*, *Charbonnages de France v. Smith*, 597 F.2d 406, 414 (4th Cir. 1979) ("[S]ummary judgment is seldom appropriate in cases where particular states of mind are decisive as elements of claim or defense."); *Oliff-Michael v. Mut. Benefit Ins. Co.*, 262 F. Supp. 2d 602, 604 (D. Md. 2003) ("Questions of fraud are fact-specific and generally involve dramatically opposite positions of the parties on the interpretation of the factual issues as applied to the law. . . . [The] resolution of the issues of fact depends upon a determination of credibility,

and [summary judgment] is not the proper stage of litigation for those credibility determinations.").

### 1. Artwork

Amilcar drafted and Mendez submitted the following statement to Nationwide as part of his claim:

> I have accumulated several collections of original and custom art over the past 30 – 35 years, most of which will never be able to be replaced due to their originality. I have attempted to compile a list of comparable works and price ranges. In total I owned between 60 and 65 pieces of art which were displayed throughout my home totaling somewhere around 120k in value if I were to give my best estimates. There are some pieces that I remember specifically and others that I have minimal recollection of. I hope that you will find the information provided useful and be able to come up with a reasonable reimbursement amount.

Doc. No. 44, E00051 (emphasis added). Mendez's inventory for the value of lost artwork also provided that the replacement cost would be $120,000.00. *Id.*, E00037. Mendez's contentions with respect to the artwork changed during the course of litigation, however. In response to Nationwide's interrogatory requesting the identification of Plaintiff's assets as of the date of the fire, Mendez listed "ART" as an asset with a value of $10,000.00. Doc. No. 45, F00015–16. During his deposition, Mendez testified as follows regarding his claims for the lost artwork:

> **Q [counsel for Nationwide]: What's your best estimate as a number of pieces of art that you were claiming against Nationwide?**
> A [Mendez]: One -- let me see; one, two, three, four, five, six, seven, eight, nine, ten, eleven; roughly around, my best estimate, maybe around 15 pieces of art.
> **Q: Certainly below 25 pieces of art?**
> A: Yes.
> **Q: And $10,000 is your best estimate?**
> A: Yes.
> **Q: And it would have been your best estimate at the time of the fire and the time now, correct?**
> A: Yes. I don't even think I claimed a number at the time of the fire, because we weren't trying to, um, we was trying to find out. I think we even asked Nationwide. We didn't know how to do it.
> ….

> **Q: You spent some time, sat down and really thought about it and came up with your best number, then; correct?**
> A: What I did was, I looked at, um, I looked at a, I think, one of the artists online, Weisbach. I have one of his paintings, and when I looked online, what I saw was what some of his works were auctioned off for. Some were like, 15,000, or 20,000, some even like 100,000, some of his work, so I used that for my best estimate.
> **Q: And your best estimate is that all of the artwork that was in your home had, and I think you used the word "reasonable" value in total of being about $10,000; is that correct?**
> A: Right.
> ….
> **Q: You indicated that you thought there was approximately 15 or so pieces of art in your home, and I assume by "pieces of art," you mean paintings; is that correct?**
> A: Yes.
> **Q: Or prints?**
> A: Yeah, or prints. Or prints or, yeah.
> **Q: Okay; but not sculpture?**
> A: Right.
> **Q: Now, with regard to those 15 prints or paintings, did any of those belong to your son?**
> A: Yes.
> **Q: Now, approximately how many?**
> A: Oh, Jeez. One, two, three -- maybe about, I don't know, seven or eight.
> ….
> **Q: So roughly, total pieces of art in your home is between 20 to 25. Is that correct?**
> A: I would say, no more than 20.

Doc. No. 42, C00040–42, 156:18–163:15.

Mendez does not dispute that the statement he initially provided—that he owned 60 to 65 pieces of art worth $120,000.00—was false. The Court concludes, however, that a reasonable jury could find that Mendez did not knowingly or intentionally submit false statements regarding the artwork, that he had reasonable grounds for believing the statements to be true, or that he lacked the requisite intent to defraud Nationwide. The statement Amilcar drafted and Mendez submitted to Nationwide volunteered that the claim was only a best estimate and that Mendez's memory regarding the claimed artwork was uncertain. The statement also implicitly requested assistance and guidance from Nationwide in coming up with a reasonable estimate. *See* Doc. No. 53-3 ¶ 5. Furthermore, Mendez's deposition testimony indicates that at the time of the fire,

he was uncertain as to how to evaluate the value of the artwork and that he was seeking assistance from Nationwide in doing so. *See* Doc. No. 42, C00040, 157:6–11. Mendez's uncertainty, which was apparently disclosed to Nationwide during the claims process, creates a genuine dispute as to whether the false statements were made knowingly, without reasonable grounds for believing them to be true, or with the purpose of defrauding Nationwide.[7]

Furthermore, a reasonable jury could rely on other facts in the record to support a conclusion that the false statements were not submitted with the requisite state of mind. For example, Mendez indicated during his EUO that he thought, at the time he submitted his claims, that his son's artwork would be covered by the Policy. *See* Doc. No. 43, D00069, 276:9–18 (stating that he included Amilcar's artwork in his initial estimates). Furthermore, Amilcar's estimate regarding "artwork" included consideration of assorted pictures and knick-knacks, not just paintings and prints. *Id.* ¶ 2. Amilcar even asked during his October 18, 2011 deposition whether "artwork" included pictures on the wall, knick-knacks, or other items, before counsel for Nationwide clarified that it meant paintings and prints. *See* Doc. No. 53-4, 26:10–19. Nationwide argues that Mendez submitted the artwork claim knowing it was false given that Mendez acknowledged at his own deposition that, at the time of the fire, he would have defined artwork to include prints and paintings and that he only owned around 15 such items. *See* Doc. No. 42, C00040, 157:6–11. The Court will not presume intent to defraud, however, and must make reasonable allowance for honest mistake and lack of judgment, particularly given Mendez's medical condition, Amilcar's participation in the claims process, and the apparent rush

---

[7] Accordingly, even if the Court struck the relevant portions of Mendez's and Amilcar's affidavits, *see supra* Part III.A.1, there is a genuine issue as to whether the false statements about the artwork were made with knowledge of their untruthfulness or reckless disregard for their truthfulness and whether they were submitted with the intent to defraud Nationwide.

to submit claims.[8]  Accordingly, there is a reasonable factual dispute as to Mendez's state of mind when he submitted the false statements to Nationwide, and it is not the Court's function to resolve that dispute on a motion for summary judgment.

### 2. Uncut Diamonds

Mendez stated in his claim that uncut diamonds valued at $30,000 were lost in the fire. Doc. No. 44, E00049.  Mendez also submitted a document titled, "Loose Diamond Crystals – Natural Diamond Crystals 2.00-4.99 Carats," containing images of uncut diamonds.  Doc. No. 40-6, H00003.  At his EUO, Mendez testified that he lost two large, uncut diamonds in the fire, that the diamonds were from Africa, that Mendez received them as gifts from his brother, and that they were worth only about $4,500.00 or $5,000.00.  Doc. No. 43, D00062–64, 248:21–253:5.  When asked why he listed $30,000, Mendez answered, "Well, if you go to replace those ones he brings from Africa."  *Id.*, D00064, 253:2–5.  As with the artwork, Mendez's position with respect to the diamonds changed during the course of litigation.  In response to Nationwide's interrogatory regarding his assets at the time of the fire, Mendez listed "Uncut Diamonds Gems," but left blank the value of the diamonds.  *See* Doc. No. 45, F00015–16. During his deposition, Mendez testified as follows:

---

[8] Nationwide argues generally that Mendez improperly attempts to put the onus on his son and undesignated "private adjusters" for the false statements and that the assistance he may have obtained from others is not factually or legally relevant as to whether Mendez made false statements.  Nationwide is correct insofar as there is no factual dispute in this case that Mendez submitted false statements to Nationwide.  However, that Amilcar (or possibly others) played a role in preparing the inventories is unquestionably relevant to whether Mendez *knew* that the inventories were false, had reasonable grounds for believing them to be true, or intended to defraud Nationwide in submitting the claims.

Nationwide also accuses Mendez of improperly injecting his medical condition into the record as an excuse for providing false information to Nationwide.  Again, Mendez's medical condition is undoubtedly relevant to his state of mind at the time the false statements were submitted to Nationwide.  The fact that Mendez was suffering from kidney failure may have, for example, contributed to mistakes or lack of judgment in submitting the false claims. Furthermore, the Court's consideration of Mendez's medical condition in assessing his state of mind in no way alters the Court's previous determination that Mendez is not entitled to recover contractual damages from Nationwide on his physical injuries.  *See* Doc. No. 23.

15

**Q [counsel for Nationwide]: Okay. But that -- and you understand that you are claiming that gems having a value of approximately $30,000 were lost in the fire.**
A [Mendez]: And that was a mistake.
**Q: That was a mistake?**
A: Yes, it was.
**Q: It's incorrect information --**
A: Yes.
**Q: -- that you gave us? Strike that. It was incorrect information that you gave to Nationwide, correct?**
A: Yes.
**Q: What was the correct information that you should have given to Nationwide?**
A: I'm not really sure. What it was, it was a gift that I had got from Africa, from my brother, which was, which was, it was a diamond, but it was, it probably wasn't, I don't know what it would be worth, to be honest with you, but it had, you know, it was different colors or whatever. It's not anything that you would probably -- well, I take it back. In this country they would probably use it to make some jewelry with it or whatever, but the reality is, I don't know if it was worth anything.
**Q: It may have been worth close to zero?**
A: It could have been. I don't know, 'cause I never seen, you know, it was a, it was a diamond. But, okay, let me put it this way; you know how diamonds come in different colors? This thing had probably every color in it. So, it wasn't, like, fully developed.
….
**Q: So, at the time that you provided that information to Nationwide -- that the gems that were destroyed in the fire had a value of approximately $30,000 -- did you believe that information to be accurate, or did you not know?**
A: I did not know.
**Q: Okay. So, instead of saying, "I do not know," you put information that it was worth approximately 30,000; is that correct?**
A: That's correct.
**Q: Why did you do that?**
A: Well, my son did it, and he did it based on what the stone looked like, and he found, I didn't even know that you, that there was actually a market for that out there. He found it on the Internet.
…
**Q: Let me ask you, sir; at the time that this information was submitted to Nationwide, the information which you now say is incorrect, at the time you submitted it to Nationwide, did you know that it might be incorrect?**
A: No.
**Q: You thought it to be correct?**
A: Yes, at the time.
**Q: What steps did you take to make a determination as to whether it was correct?**
A: Um, just based on what we were told. We went to the Internet. We found something that looked similar to it, and we put it down.
….
**Q: Sir, at the time, then, you had no idea what these diamonds were worth, at the time that you submitted it to Nationwide. Is that correct?**

16

>A: That's correct.
>**Q: And that's at the time you submitted Exhibit 17 to Nationwide; is that correct?**
>A: Now, what are we talking about? The whole thing, or just the 30,000?
>**Q: Just the $30,000.**
>A: That's correct.

Doc. No. 42, C00025–26, 94:10–101:6.

As with the artwork, Mendez does not dispute that the information he initially provided—that he lost uncut diamonds worth $30,000.00—was false. However, it is a question for the jury as to whether Mendez submitted the false statement with knowledge that it was false, with reckless disregard for the truth, or with the intent to defraud Nationwide. Throughout his deposition, Mendez admitted that he was unsure of the value of the diamonds, but that the initial $30,000 claim was his and Amilcar's best estimate as to the value of the stones, and that he thought the estimate may have been correct. Amilcar testified that the estimate he helped his father submit to Nationwide was based on past conversations with Mendez in addition to online research. *See* Doc. No. 53-4, 68:12–75:12. Mendez acknowledges that their approach "may have not been the best method" and that "one could even argue that this method of valuation lacked good judgment," but that this does not make the claim fraudulent. Doc. No. 53, at 15–16. The Court agrees with Mendez. Nationwide essentially asks the Court to infer from Mendez's and Amilcar's testimony that the $30,000.00 valuation constituted a reckless disregard for the truth, and that Mendez must have intended to defraud Nationwide based on his submission of the claim. This determination must be left to the jury based on its evaluation of the witnesses' credibility and its weighing of the evidence.

### 3. Furs

In the inventory submitted to Nationwide, Mendez claimed that two furs were lost in the fire: the first was listed as a black mink coat valued at $5,495.00, and the second was listed as a

red fox fur jacket valued at $2,495.00. Doc. No. 44, E00036. Mendez also submitted a photograph of a woman wearing two furs and a retailer's listing of a red fox fur jacket. *Id.*, E00030; Doc. No. 40-8, J00001. As with the other items, Mendez's position regarding the furs changed in the course of litigation. At his EUO, for example, Mendez testified that the second coat, initially listed as a red fox fur, was in fact a raccoon coat. Doc. No. 43, D00076, 301:20–304:18. Later, at his deposition, Mendez acknowledged that the raccoon coat actually belonged to his son and was not destroyed in the fire:

> **Q [counsel for Nationwide]: Was this fur destroyed in the fire?**
> A [Mendez]: Um, the brown one was not. A black one was.
> **Q: There's two furs in these pictures?**
> A: Yes.
> **Q: Okay. So which one do you contend was destroyed in the fire?**
> A: The black one.
> ….
> **Q: Any of the coats that we have been discussing up to this point in time, were any of them your son's coats?**
> A: Yes.
> **Q: Which ones were your son's coats?**
> A: The raccoon.
> **Q: And that raccoon was a coat that you made a claim against Nationwide for, correct?**
> A: Correct.
> **Q: And there's only one raccoon coat, correct?**
> A: Correct.
> **Q: And if you made a claim against Nationwide for the raccoon coat, was that just an error that you made?**
> A: It was a error, it was a error that he made, because what happened was, he didn't know that the coat was in storage at the time of the fire.
> ….
> **Q: And let me make sure; there was no, you never owned a natural red fox fur jacket; is that correct?**
> A: That's correct.
> **Q: Instead, you owned a raccoon coat?**
> A: Correct.
> **Q: Actually, your son owned the raccoon coat, correct?**
> A: Correct.
> **Q: And you were aware that this information, which is Exhibit Number 19, was submitted to Nationwide, correct?**
> A: Correct.

18

> **Q: And that you never pulled it from the materials that you had, which was submitted to Nationwide, correct?**
> A: That's correct.
> **Q: And you never told anyone in your Examination Under Oath that the raccoon, it was really a raccoon coat and the raccoon coat was actually in storage; is that correct?**
> A: That's correct.
> **Q: Did you know it at the time that you went to your Examination Under Oath?**
> A: No.
> **Q: When did you learn that the raccoon coat was in storage?**
> A: I got a call from Adrianna Furs, um, whew, it was after that. It was during either the spring or the summer, around May or June, and I had owed them some money, and I had forgotten about it, and that was when we found out.
> **Q: And that raccoon coat was your son's coat, correct?**
> A: Correct.
> **Q: Why, sir, did you make a claim for a loss of this fur coat, the raccoon coat?**
> A: Um, 'cause I forgot about it. I mean, really, I forgot about it.
> **Q: Sir, why were you making a claim against Nationwide for your son's raccoon coat?**
> A: Well, he put it, he put it all together. Like I said, Nationwide never explained anything on how to do this, other than they said it was replacement cost. They told us that, um, they know everything had gotten destroyed. They told us to go to the Internet, find things that pretty much looked like what we had.
> **Q: Are you aware, sir, today, that you cannot make a claim for your son's coat?**
> A: Um, am I aware today? If that's what you're telling me, yes.

Doc. No. 42, C00028–32, 108:15–124:11.

As with the artwork and uncut diamonds, Mendez does not dispute that he provided false information to Nationwide regarding the furs. Again, however, there is a genuine issue as to whether Mendez made the statements knowing that they were false or with reckless disregard of the truth and whether he acted with the purpose of defrauding Nationwide. Mendez continues to claim, as he did in his deposition testimony, that he and Amilcar were honestly mistaken in identifying the raccoon coat as a red fox fur coat and that they honestly forgot that the raccoon coat was in storage at the time of the fire. *See* Doc. No. 53-3, ¶¶ 6–9. Mendez also argues, consistent with his deposition testimony, that although the raccoon coat belonged to his son, he thought he could claim it under the Policy at the time he submitted the inventories to

Nationwide. It will be the jury's function, not the Court's, to determine Mendez's state of mind at the time he submitted the false statements.

## IV. CONCLUSION

For the foregoing reasons, Defendant's Motion for Summary Judgment will be DENIED. A separate Order will follow.

\_\_\_September 28, 2012\_\_\_\_  /s/
      Date                                                   Alexander Williams, Jr.
                                                            United States District Judge